*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0125**

State of Minnesota,
Respondent,

vs.

Justin Christopher Mitchell,
Appellant.

**Filed January 5, 2015
Affirmed in part, reversed in part, and remanded
Kirk, Judge**

Stearns County District Court
File No. 73-CR-13-1928

Lori Swanson, Attorney General, James B. Early, Assistant Attorney General, St. Paul,
Minnesota; and

Janelle Kendall, Stearns County Attorney, St. Cloud, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, David W. Merchant, Assistant
Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Hooten, Presiding Judge; Rodenberg, Judge; and Kirk,

Judge.

UNPUBLISHED OPINION

**KIRK**, Judge

On appeal from his convictions of witness tampering and terroristic threats, appellant argues that: (1) the district court abused its discretion by admitting the victim's out-of-court statements; (2) the district court committed plain error by allowing the state to present evidence of a prior threat made by appellant; (3) the prosecutor committed misconduct; and (4) his sentence for his witness-tampering conviction was based on an incorrect criminal-history score. We affirm in part, reverse in part, and remand to the district court.

## FACTS

On the morning of March 1, 2013, appellant Justin Christopher Mitchell argued with his ex-girlfriend, N.A., at her apartment, and then left. Because N.A. suspected that appellant had stolen her phone, she called 911. City of St. Cloud Police Officer Tomas Villanueva responded to the call and took a report from N.A.

Later that day, N.A. went to pick up her children, one of whom is appellant's son, from daycare. N.A.'s friend F.J. accompanied her to the daycare in her own vehicle. As N.A. was putting her children in her vehicle, appellant approached her. N.A. and appellant argued, and then N.A. quickly went inside the daycare. Appellant tapped on F.J.'s window, had a brief conversation with her, and then returned to his vehicle.

N.A. called 911, and told the operator that appellant threatened her with a gun at the daycare. She stated that appellant learned that she had called the police earlier to report him for stealing her phone and came to the daycare at the time she picks up her

children to confront her. N.A. stated that appellant threatened to shoot her and then he went to his vehicle and came back with a gun. She clarified that she did not see the gun, but her friend saw it. N.A. told the operator that her friend followed her to the daycare in her own car because "she knew I was scared that I had called the police on him earlier" and that appellant also threatened to shoot her friend.

Several police officers responded to N.A.'s 911 call and arrived at the daycare, including Officer Villanueva. Officer Villanueva observed that N.A. seemed "very frightened" and "shaken up." Approximately 10 to 15 minutes later, Officer Villanueva took a statement from N.A. at her apartment. N.A. stated that earlier at the daycare she noticed appellant standing next to her after she put her children in her vehicle. Appellant told her that he was "gonna shoot [her] ass" and "gonna clip [her]" and pointed his finger at her "pretending it was a gun." Appellant walked back to his vehicle, grabbed something, and then started running toward her. At that point, N.A. ran inside the daycare.

St. Cloud Police Officer Dan Greenwald also responded to the daycare in response to the 911 call. He spoke to F.J., who immediately told him that she did not want to be a witness. As a result, Officer Greenwald activated the voice recorder in his pocket and recorded their conversation. F.J. told Officer Greenwald that N.A. had asked her to follow her to the daycare because N.A. was scared that appellant would confront her about her report to the police about him earlier that day. F.J. stated that she was parked in her vehicle behind N.A.'s vehicle at the daycare, and she did not see appellant approach N.A.'s vehicle. She saw appellant say something to N.A. and then walk back

3

toward his vehicle while N.A. ran toward the daycare. Appellant then approached F.J.'s vehicle and told F.J., "[I]f she comes to your house I'm gonna shoot your house up." F.J. told Officer Greenwald that she was "nervous" and "shaking," she did not want to get involved in a conflict between appellant and N.A., and she did not want appellant to hurt N.A. Officer Greenwald asked F.J. if she had seen a gun, and F.J. stated that she did not actually see appellant with a gun, but she was unsure if he had a gun in his hand.

Police officers stopped appellant six blocks away from the daycare. The officers arrested appellant for making terroristic threats, placed him in handcuffs, and transported him to the jail. The officers searched appellant and his vehicle for a weapon with appellant's permission, but they did not find a gun. Officer Greenwald gave appellant a *Miranda* warning before interviewing him at the jail. Appellant admitted that he spoke to N.A. and F.J. at the daycare, but denied that he verbally threatened them or that he had a gun. Respondent State of Minnesota charged appellant with aggravated first-degree tampering with a witness and two counts of terroristic threats.

At the jury trial, N.A. testified that she and appellant argued at her apartment and at the daycare later that afternoon, but she testified that she could not remember telling a police officer that appellant threatened her or pointed his hand at her in the shape of a gun. F.J. testified that she went to the daycare with N.A., but denied that she told the police that she did so because N.A. was scared. F.J. testified that she saw appellant talk to N.A., but she could not hear what they said. F.J. testified that she also had a conversation with appellant, but she did not remember what he said. F.J. denied that she

told the police that appellant told her he would shoot up her house or that she saw appellant with a gun.

The jury found appellant guilty of tampering with a witness and making terroristic threats to F.J., but not guilty of making terroristic threats to N.A. The district court sentenced appellant to 160 months in prison for tampering with a witness and one year and one day for terroristic threats, to be served consecutively. This appeal follows.

## D E C I S I O N

**I.** **The district court did not abuse its discretion by admitting N.A.'s out-of-court statements.**

Appellant argues that the district court abused its discretion by admitting statements that N.A. made to police the day of the incident and to appellant during later telephone conversations under Minn. R. Evid. 807. "Evidentiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion. On appeal, the appellant has the burden of establishing that the [district] court abused its discretion and that appellant was thereby prejudiced." *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003) (citation omitted).

Hearsay is generally inadmissible to prove the truth of the matter asserted, except as provided by the rules of evidence. Minn. R. Evid. 801, 802. Under rule 807:

> A statement not specifically covered by rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of

5

> justice will best be served by admission of the statement into evidence.

In making a reliability determination under rule 807, courts "use the totality of the circumstances approach, looking to all relevant factors bearing on trustworthiness to determine whether the extrajudicial statement has circumstantial guarantees of trustworthiness equivalent to" other exceptions to hearsay. *State v. Robinson*, 718 N.W.2d 400, 408 (Minn. 2006) (quotations omitted). Under rule 807, the relevant factors are the circumstances that were present when the statement was made. *State v. Ahmed*, 782 N.W.2d 253, 260 (Minn. App. 2010).

In general, Minnesota appellate courts consider the following factors to determine whether a statement is admissible under rule 807:

> [W]hether the statement was given voluntarily, under oath, and subject to cross-examination and penalty of perjury; the defendant's relationship to the parties; the declarant's motivation to make the statement; the declarant's personal knowledge; whether the declarant ever recanted the statement; the existence of corroborating evidence; and the character of the declarant for truthfulness and honesty.

*State v. Davis*, 820 N.W.2d 525, 537 (Minn. 2012). In considering whether a recanting witness's prior inconsistent statement is admissible under rule 807, appellate courts consider whether: (1) the witness was available for cross-examination; (2) there was a dispute over whether the witness made the prior statement or the content of the statement; (3) the statement was against the witness's penal interest; and (4) the statement was consistent with all of the other evidence that the state introduced. *State v. Ortlepp*, 363 N.W.2d 39, 41-42, 44 (Minn. 1985).

### A.   N.A.'s statement to police.

N.A. told Officer Villanueva shortly after the incident at the daycare that appellant told her he was "gonna shoot [her] ass" and "gonna clip [her]," and that he "point[ed] his finger at [her] pretending it was a gun." N.A. also stated that F.J. told her she saw a gun. At trial, the prosecutor argued for the admission of N.A.'s statement to Officer Villanueva under Minn. R. Evid. 807 and *Ortlepp*. Appellant's counsel objected. The district court determined that the statement was admissible as substantive evidence under Minn. R. Evid. 807. The state offered the recording of N.A.'s statement as an exhibit during Officer Villanueva's testimony, and the district court received it into evidence.

Three of the *Ortlepp* factors weigh in favor of the statement's admissibility. *See* 363 N.W.2d at 44. First, we cannot conclude that N.A. was unavailable for cross-examination. N.A. appeared and testified on the first day of trial. After N.A. testified, the prosecutor sought to admit N.A.'s statement to Officer Villanueva into evidence. While considering whether to admit the statement, the district court asked the prosecutor whether N.A. was still subject to her subpoena. The prosecutor responded that she had not released N.A. The district court then noted that the defense could recall N.A. if they wanted to cross-examine her regarding her statement. The district court asked if N.A. was still outside the courtroom, and the prosecutor responded, "Oh, no, she stormed out of here, but we didn't release her." Appellant's counsel did not object, and did not request to recall N.A. While the prosecutor's statement indicates that N.A. was not in the courtroom at that moment, she was still subject to the subpoena. Appellant was not

7

prevented from cross-examining N.A. when he did not request to do so and the district court did not have the opportunity to enforce the subpoena.

Second, N.A. admitted that she spoke to police officers immediately after the incident, and her statement was taped. N.A. did not deny that she told the officers that appellant threatened her or pointed his hand like a gun toward her; instead, she testified that she did not remember making those statements. Third, N.A.'s statement to Officer Villanueva was consistent with her 911 phone call to police reporting the incident at the daycare and the recorded conversation between F.J. and Officer Greenwald. The statement was also consistent with statements N.A. made during recorded phone calls with appellant while he was in jail. However, one *Ortlepp* factor does not weigh in favor of admissibility because the statement was not against N.A.'s penal interest.

A majority of the factors described in *Davis* also weigh in favor of admissibility. *See* 820 N.W.2d at 537. N.A. gave the statement voluntarily shortly after the incident, although the statement was not under oath and she was not subject to cross-examination. At the time N.A. made the statement, she was no longer in a relationship with appellant, but appellant stayed at her apartment and received his mail there, they continued to have a sexual relationship, and appellant maintained frequent contact with their son.

Appellant contends that N.A. had a motive to fabricate the statement because she wanted appellant out of her life. But at the time N.A. made the statement, her primary motivation was to obtain assistance from the police in an emergency situation. N.A. called police immediately after the confrontation, and Officer Villanueva took her statement within 10 to 15 minutes of his arrival at the daycare. During her statement,

8

N.A. recounted what had just occurred. She explained that she was scared for her life during the incident and she was still scared that appellant was going to come after her.

N.A. had personal knowledge because the statement was her description of what she had experienced. And N.A. only partially recanted the statement. Although she testified at trial that she did not see appellant with a gun and he did not threaten her, she did not testify that the statements she made to Officer Villanueva were inaccurate; rather, she testified that she could not remember what she said to him.

We are also unpersuaded by appellant's argument that the statement is unreliable because N.A. was "severely intoxicated" when she made it. N.A. testified that she did not remember what she said to Officer Villanueva because she "was really, like, out of it at that moment. Like, I was mad. I was hurt and I was high. . . . my mind is, like, blurry about the whole situation." But Officer Villanueva testified that, based on his training and experience, he did not detect any signs that N.A. was under the influence of controlled substances at the time she made the statement.

Under the totality of the circumstances, N.A.'s statement to police had circumstantial guarantees of trustworthiness equivalent to other hearsay exceptions. Therefore, the district court did not abuse its discretion by admitting it under rule 807.

**B. N.A.'s statements in the jail phone calls.**

On March 2, appellant called N.A. several times from jail. During the phone calls, N.A. made numerous statements about the incident at the daycare the previous day. N.A. stated several times that F.J. said she saw appellant with a gun. She also stated that F.J. said that appellant tapped on her window and told her he was going to shoot up her

house.   The prosecutor sought to admit the recordings of the jail phone calls as substantive evidence during trial; appellant objected.   The district court admitted the recordings of the phone calls under Minn. R. Evid. 807 and played them for the jury.

The majority of the *Ortlepp* factors weigh in favor of admission of the recordings of the jail phone calls.  *See* 363 N.W.2d at 44.  N.A. was available for cross-examination, the statements were recorded, and there is no dispute that N.A. made the statements.  The statements were consistent with N.A.'s statement to Officer Villanueva and F.J.'s recorded statements to police.  However, they were not against N.A.'s penal interest.

Most of the factors described in *Davis* also weigh in favor of admission of the recordings.  *See* 820 N.W.2d at 537.  N.A. voluntarily made the statements during a conversation with appellant, but they were not made under oath and she was not subject to cross-examination.  N.A. did not have any motive to fabricate the statements because they were made during a personal conversation that she had with appellant.  The statements related to N.A.'s personal knowledge of the incident at the daycare.  N.A. did not recant the statements, and they were corroborated by her recorded statement to Officer Villanueva and F.J.'s recorded statement to police.

Under the totality of the circumstances, N.A.'s statements during the phone conversations had circumstantial guarantees of trustworthiness equivalent to other hearsay exceptions, and the district court did not abuse its discretion by admitting them.

10

**II.** **The district court did not commit plain error by allowing the state to present evidence of a prior threat made by appellant.**

Prior to trial, the state filed notice of its intent to introduce evidence of the incident that occurred between appellant and N.A. on the morning of March 1, including appellant's statement to N.A. "that if she ever reported anything to the police he would kill her." The state argued that the evidence was admissible as *Spreigl* evidence for the purpose of establishing appellant's motive and an absence of mistake or accident, or as relationship evidence under Minn. Stat. § 634.20 (2014). Before the trial began, the prosecutor argued that the evidence was admissible as *Spreigl* evidence. The district court responded that it did "not view the altercation at the apartment or the issues having to do with the missing phone as being *Spreigl* evidence. I think that is evidence related to the episode that we are dealing with here today. So, that will generally come in." During the trial, Officer Villanueva testified that when he responded to N.A.'s 911 phone call reporting that appellant had stolen her phone, N.A. told him that appellant "had threatened that if she ever called the police I guess he would cause her harm." Appellant did not object.

Appellant concedes that he did not object when Officer Villanueva testified about the statement, but he argues that this court should review the district court's admission of the evidence for harmless error because he objected in a pretrial motion in limine to the admission of all of N.A.'s out-of-court statements. This court has previously held that "evidentiary objections should be renewed at trial when an in limine or other evidentiary ruling is not definitive but rather provisional or unclear, or when the context at trial

11

differs materially from that at the time of the former ruling." *State v. Word*, 755 N.W.2d 776, 783 (Minn. App. 2008). Here, appellant did not specify in his motion in limine that he was objecting to the admission of his prior threat to harm N.A. or object at the time of Officer Villanueva's testimony. The district court ruled before the trial started that generally prior-crimes evidence was inadmissible, but it was not clear that this ruling applied to Officer Villanueva's testimony about appellant's prior threat to N.A. Thus, appellant was required to renew his objection at the time of Officer Villanueva's testimony, which he failed to do.

We may examine an unobjected-to error for plain error, which requires (1) error, (2) that is plain, and (3) that affects a defendant's substantial rights. *State v. Kuhlmann*, 806 N.W.2d 844, 852 (Minn. 2011); *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). "An error is plain if it was clear or obvious." *State v. Strommen*, 648 N.W.2d 681, 688 (Minn. 2002) (quotations omitted).

Appellant argues that the statement was inadmissible *Spreigl* evidence. In general, "[e]vidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith." Minn. R. Evid. 404(b). Such evidence, referred to as *Spreigl* evidence, may be admissible for other reasons, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* But Minnesota appellate courts have traditionally "treated evidence that illuminates the history of the relationship between an accused and a victim differently from other, collateral *Spreigl* evidence." *State v. McCoy*, 682 N.W.2d 153, 161 (Minn. 2004) (quotation omitted). This is appropriate because "domestic abuse is

12

unique in that it typically occurs in the privacy of the home, it frequently involves a pattern of activity that may escalate over time, and it is often underreported." *Id.* Under Minn. Stat. § 634.20 (2014), "[e]vidence of domestic conduct by the accused against the victim of domestic conduct, or against other family or household members, is admissible unless the probative value is substantially outweighed by the danger of unfair prejudice."

Here, the statement at issue constituted relationship evidence under Minn. Stat. § 634.20. The statement illuminates the history of N.A.'s relationship with appellant and provides context for the incident that occurred at the daycare. As a result, the district court did not commit plain error by allowing the state to offer the evidence at trial.

## III. The prosecutor did not commit misconduct.

Appellant argues that the prosecutor committed misconduct by: (1) making certain statements during her closing and rebuttal closing argument; and (2) by soliciting testimony from Officer Villanueva regarding a prior threat made by appellant to N.A. The state argues that appellant waived this argument because he did not raise a timely objection.

This court may review an unobjected-to error if it constitutes plain error affecting a defendant's substantial rights. *State v. Ramey*, 721 N.W.2d 294, 298 (Minn. 2006). When a defendant fails to object to prosecutorial misconduct, we apply a modified plain-error standard. *Id.* at 302. Under that standard, the defendant first must establish that the prosecution committed an error that contravenes caselaw, a rule, or a standard of conduct, or that is otherwise "plain." *Id.* If the defendant makes that showing, the burden then shifts to the state to demonstrate that the misconduct did not affect the defendant's

13

substantial rights. *Id.* We will reverse a conviction due to prosecutorial misconduct "only if the misconduct, when considered in light of the whole trial, impaired the defendant's right to a fair trial." *State v. Powers*, 654 N.W.2d 667, 678 (Minn. 2003).

Appellant contends that he objected in general to the prosecutor's closing argument. But appellant did not raise a timely objection to the prosecutor's closing argument because he did not object until after the jury had already retired. *See Jennie-O Foods, Inc. v. Safe-Glo Prods. Corp.*, 582 N.W.2d 576, 581 (Minn. App. 1998) ("In order to raise the claim of [prosecutorial] misconduct there must be an objection at the time of the alleged misconduct, or at the close of the argument when it has been taken down by the reporter, and before the jury retires." (quotation omitted)), *review denied* (Minn. Oct. 20, 1998). Therefore, we apply the modified plain-error standard to all of appellant's prosecutorial-misconduct arguments.

### A.     Closing argument and rebuttal closing argument.

We review closing arguments in their entirety to determine whether prosecutorial misconduct occurred. *State v. Vue*, 797 N.W.2d 5, 15 (Minn. 2011). "The prosecutor has the right to present to the jury all legitimate arguments on the evidence, to analyze and explain the evidence, and to present all proper inferences to be drawn therefrom." *State v. Williams*, 586 N.W.2d 123, 127 (Minn. 1998) (quotation omitted). The prosecutor has "considerable latitude" in making closing argument and is not required to make a colorless argument. *Id.*

First, appellant argues that the prosecutor committed misconduct during her rebuttal closing argument by referring to facts not in evidence. "A prosecutor's closing

14

argument should be based on the evidence presented at trial and inferences reasonably drawn from that evidence." *State v. DeWald*, 463 N.W.2d 741, 744 (Minn. 1990). The statement appellant objects to is the following:

> This was the one time [N.A.] stood up to [appellant] by getting someone else involved. He lost his temper and went to extreme measures to control her again, to get her to not cooperate with the prosecution of him, to keep her from calling the police on him again, and he made a threat to her and he made a serious threat to her.
>
> You heard her say in that jail phone call that she knew that he had access to guns in the past. Just goes to the credibility of that threat. It goes to the seriousness of this threat.

Appellant argues that the record does not contain any evidence that appellant had access to guns in the past. We disagree. The prosecutor stated that N.A. said in one of the jail phone calls that "she knew that [appellant] had access to guns in the past." That statement is an accurate summary of a statement made by N.A. in one of the jail phone calls that was admitted into evidence. N.A. acknowledged several times during her phone calls with appellant that she did not see him with a gun at the daycare. But when appellant stated that he "never" had a gun, N.A. responded to him by stating, "You do have a gun," which appellant again denied. The prosecutor's statement during closing argument referred to N.A.'s statement; she did not assert that the statement was true.

Appellant next argues that the prosecutor's statement violated the district court's ruling that evidence that appellant previously had a gun was inadmissible. Appellant's argument is based on a discussion between the parties and the district court at trial about redacting portions of the jail phone call transcripts. At the conclusion of that discussion,

the district court asked, "So there won't be any reference to [appellant] previously having a gun?" By making that statement, the district court was clarifying what the prosecutor planned to redact from the transcript; it was not ordering that any evidence appellant had a gun in the past was inadmissible.

Appellant also contends that the prosecutor's statement diverted the jury from its duty of determining whether the evidence established appellant's guilt beyond a reasonable doubt. We disagree. The prosecutor referred to evidence in the record in support of her argument that N.A. took appellant's threat at the daycare seriously, and her comments were not intended to inflame the passions of the jury. *Cf. State v. Porter*, 526 N.W.2d 359, 365 (Minn. 1995) (concluding that the prosecutor committed misconduct by making statements that "permeated the entire closing argument" and "suggested to the jurors that they would be suckers if they acquitted Porter and there would be no sedative or salve to make them feel better").

Second, appellant contends that the prosecutor committed misconduct when she made the following statement during her closing argument:

> [L]adies and gentlemen of the jury, you are about to come to a fork in the road when you go back and deliberate. You are going to have a decision to make right away, right when you first set foot in that deliberation room, and it's not going to be a decision that you probably thought about that you would have to make directly when you came in here for jury duty. You need to decide whether or not you want to care. And why should you care? [N.A.] doesn't care about this case, [F.J.] clearly doesn't care about this case, so why should you really suss out these facts, deliberate, go into the details of this offense and see if the defendant is guilty or not when clearly the two victims here don't care? You should care, ladies and gentlemen of the jury, because you took an

16

oath at the very beginning of this trial. You took an oath honoring that you would go through all of the facts, you would suss out the details, and you would apply them to the law.

Ladies and gentlemen of the jury, the State of Minnesota and our community has laws and the laws are designed to protect people; they're designed to protect people whether or not they want to be protected. And you as jurors, you have an incredibly important duty here to take these laws seriously, to take alleged violations of these laws seriously, and to come up with a fair and just verdict.

Appellant argues that the prosecutor's statement urging the jury to enforce the laws to protect the people of Minnesota "whether or not they want to be protected" was misconduct because it diverted the jury from its duty to decide whether the evidence satisfied the elements of the offense to "broader issues that went well beyond the jury's role." He also contends that the remarks were calculated to appeal to the jurors' emotions. "It is improper for a prosecutor to urge the jury to protect society with its verdict." *State v. Hoppe*, 641 N.W.2d 315, 320 (Minn. App. 2002), *review denied* (Minn. May 14, 2002). In addition, "[a] prosecutor must not distract the jury from its proper role of deciding whether the state has met its burden." *Id.* (quotation omitted). A prosecutor is also prohibited from inflaming the jury's passions or prejudices. *State v. Salitros*, 499 N.W.2d 815, 818 (Minn. 1993).

We disagree with appellant. The prosecutor's statements reinforce that the jury must focus on deciding whether the state met its burden of proving the offenses. During her testimony, N.A. testified that she was only testifying because she was ordered to be there, she believed appellant was a good guy, and she was no longer scared of him. She

17

also testified that although she remembered making a statement to police and calling 911, she did not remember being threatened by appellant. Similarly, F.J. testified that she did not want to testify, she was only there because she was ordered to be, and she did not remember her statements to officers. Because of the victims' reluctant testimony, the prosecutor explained during closing argument why the jury was required to decide whether the state proved the offenses beyond a reasonable doubt even when the victims did not support the prosecution of appellant. The prosecutor never urged the jury to find appellant guilty in order to protect society as a whole and did not seek to inflame the jurors' passions or prejudices.

Finally, appellant argues that the prosecutor committed misconduct by telling the jury that N.A.'s out-of-court statements were "testimony." During her closing argument, the prosecutor stated that N.A. told Officer Villanueva that appellant had threatened her that he would harm her if she called the police, which "rang true" because he later confronted her and threatened her at the daycare. The prosecutor argued that appellant told N.A. during his phone calls to her from jail that "if he really would have had a gun, if he was waving it around, he would have shot her there. He was again, [']It's your problem, [N.A.]. Fix it, [N.A.].'" The prosecutor then stated, "Of course her testimony was going to change. . . . Her testimony before that jail phone call and during that jail phone call is believable."

The prosecutor's statement about N.A.'s "testimony" was incorrect because those out-of-court statements are not testimony. *See Black's Law Dictionary* 1613 (9th ed. 2009) (defining "testimony" as "[e]vidence that a competent witness under oath or

18

affirmation gives at trial or in an affidavit or deposition"). But this error does not rise to the level of plain error affecting appellant's substantial rights. *See Ramey*, 721 N.W.2d at 298. The prosecutor's use of "testimony" in this way was very brief, and she did not consistently refer to N.A.'s statements as testimony throughout her closing argument. In fact, earlier in her closing argument the prosecutor specifically distinguished between N.A.'s out-of-court statements and her testimony at trial.

Appellant also contends that the prosecutor misstated the burden of proof by telling the jury it should discard any evidence that did not establish the defendant's guilt. During her closing argument, the prosecutor stated:

> Proof beyond a reasonable doubt, as [the district court] just defined, does not mean 100 percent certainty. It does not mean proof beyond all doubt. What it means is that the only reasonable logical conclusion you can make is that defendant committed these crimes. If there's anything that's not reasonable, that's not logical, that goes against his guilt, that can be discarded. The only thing that makes reasonable doubt are things that apply to your common sense, that common sense would make a doubt in this case.

Viewed in context, the prosecutor did not tell the jury that it could "discard" *all* evidence that did not establish appellant's guilt. Rather, the prosecutor told the jury that it could discard evidence that goes against appellant's guilt *if* it was not reasonable or logical.

## B.    Other misconduct.

Appellant contends that the prosecutor committed misconduct when she elicited evidence that appellant had previously threatened N.A. We disagree. As previously discussed, the district court did not err by allowing the state to present Officer Villanueva's testimony that N.A. told him that appellant previously threatened her that he

19

would cause her harm if she called the police. Because this evidence was properly admitted into evidence, the prosecutor did not commit misconduct by referring to it during her closing argument. *See Williams*, 586 N.W.2d at 127.

**IV.    The district court erred by including appellant's juvenile Illinois offense in the adult section of his criminal-history score.**

This court will not reverse the district court's determination of a defendant's criminal-history score absent an abuse of discretion. *State v. Stillday*, 646 N.W.2d 557, 561 (Minn. App. 2002), *review denied* (Minn. Aug. 20, 2002). The interpretation of the sentencing guidelines is a question of law that this court reviews de novo. *State v. Williams*, 771 N.W.2d 514, 520 (Minn. 2009). A defendant can challenge his criminal-history score at any time. *State v. Maurstad*, 733 N.W.2d 141, 147 (Minn. 2007).

The district court sentenced appellant to 160 months in prison for the witness-tampering conviction. This sentence was within the presumptive sentencing guidelines for a severity level nine offense with a criminal-history score of four. *See* Minn. Sent. Guidelines 4.A (2012). According to the sentencing worksheet, appellant's criminal-history score was based on three prior adult felony convictions, each of which was given 1.5 points. One of those offenses was a first-degree burglary conviction from Cook County, Illinois. Appellant committed the offense when he was 17 years old.

Appellant argues that his juvenile conviction from Illinois was incorrectly included in the adult section of his criminal-history score. We agree. Under the Minnesota Sentencing Guidelines, an out-of-state conviction for a felony offense that was committed when the defendant was under 18 years old "can be included in the adult

history section only if the factfinder determines that it is an offense for which the offender would have been certified to adult court if it had occurred in Minnesota." Minn. Sent. Guidelines 2.B.5.e (2012). Here, the district court did not find that appellant's first-degree burglary conviction is an offense for which he would have been certified to adult court if he had committed the offense in Minnesota. Therefore, the district court erred by applying a criminal-history score that included that conviction in the adult section of the criminal-history score. We remand to the district court to make the required finding under Minn. Sent. Guidelines 2.B.5. If the district court does not make that finding, it should recalculate appellant's criminal-history score without including that offense in the adult section and resentence appellant in accordance with the correct criminal-history score.

**Affirmed in part, reversed in part, and remanded.**